**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| MARIO MARTINEZ,<br><br>Plaintiff,<br><br>v.<br><br>ELDAN RECYCLING A/S and ELDAN, INC.,<br><br>Defendant. | ) | Case No. 22-cv-4253<br><br>Judge Sharon Johnson Coleman |

**MEMORANDUM OPINION AND ORDER**

Plaintiff Mario Martinez suffered severe injuries to his arm while operating an M6 cable-stripper machine (the "M6") designed, manufactured, and sold by Defendants Eldan Recycling A/S and Eldan, Inc. (collectively "Eldan").[1] The M6 is designed to be used with an installed bushing that guides a particular size of cable into the machine. The bushing also prevents users from sticking their hands into the machine. The M6 that Mr. Martinez operated did not have a bushing installed, and all parties agree that his injury would not have happened if the machine had been used according to manufacturer guidelines. However, Mr. Martinez claims that the M6's design was defective because its safety mechanisms could and would be easily circumvented. He believes that Eldan should have foreseen this possibility and designed the machine differently, and that its failure to do so renders it liable for his injury.

Before the Court today is Eldan's motion for summary judgment. Dkt. 137. Eldan argues that it is entitled to judgment as a matter of law because the undisputed facts establish that it could not

---

[1] Eldan Recycling A/S, a Danish company, designed and manufactured the machine. Defendant Eldan, Inc., which is Eldan Recycling A/S's American affiliate and distributor, sold the machine. Defendants concede, without opposition from Mr. Martinez, that the two Eldan companies can be treated collectively for the purpose of resolving the instant motion. Dkt. 139 at *1 n.1.

reasonably have foreseen that such an accident would occur and that it adequately warned operators of the dangers of using the M6 without a bushing. However, the Court disagrees. Factual disputes exist as to the precise means by which the M6 that Mr. Martinez operated was modified; as to what incentives might exist to run an M6 without a bushing; and as to the adequacy of Eldan's warnings. These questions must be entrusted to a jury. Accordingly, the Court denies Eldan's motion for summary judgment.

## BACKGROUND

### Factual Background

Unless otherwise noted, the following facts are drawn from the parties' respective statements of undisputed facts and are deemed admitted. *See* dkt. 138 [hereinafter DSOF] (Defendants' statement); dkt. 142-1 [hereinafter PSOF] (Plaintiff's statement).

Defendant Eldan designs, manufactures, and sells recycling products. One of the company's products is the M6 cable stripper. The M6 is an industrial machine that removes outer plastic insulation covering the metal conductors in electrical cables. The machine is designed to operate with a bushing installed on its inlet. The M6's bushings, which come in various sizes that can be swapped in and out by the operator, help guide a cable of a particular diameter into the machine and also help prevent operator contact with the dangerous cutting mechanisms inside the M6. Replacing one bushing with another would typically take a worker two or three minutes. Dkt. 138-9 § 10.1; *see also* dkt. 138-11 at *2. When a bushing is installed, it depresses a safety interlock switch inside the bushing's housing; if that switch is not depressed, then—under normal conditions—the M6 will not operate. However, it is possible to modify the M6 to enable it to run without a bushing installed. One could electrically circumvent the safety mechanism by using a jumper to connect the switch's two wires, which would bypass the switch. This sort of modification would require specialized tools and knowledge of the M6's internal wiring. One could also mechanically circumvent the safety mechanism by using duct

tape or a similar device to hold the interconnect switch down.[2] Only 4.4 pounds of pressure is needed to depress the switch.

Plaintiff Mario Martinez was a night-shift worker for United Scrap Metal, Inc. ("USM") at a facility in Cicero, Illinois. The facility operates nearly twenty-four hours a day, with cable stripper machines (such as the M6) running all day long. It was a common practice for facility employees to operate cable strippers without a bushing, although deposed USM managers insisted that they instructed employees to always have a bushing installed.[3] Mr. Martinez testified that he only used a bushing when processing particularly thick cable, which was also a common practice for workers on the morning shift.

On May 11, 2020, Mr. Martinez had been a USM employee for about three months. Dkt. 138-8 at 91:7–10. He was severely injured while operating, without a bushing, an M6 that USM had purchased from Eldan on December 12, 2012. All parties agree that this particular machine arrived at USM in its intended condition, with all safety systems functional and all required safety decals.[4] From the time of its delivery until May 11, 2020, the machine was in the exclusive possession and control of USM. All parties agree that, at some point prior to the accident, the M6 in question was modified to

[2] This is drawn from Mr. Martinez's statement of facts. PSOF ¶ 5. Eldan objects to the cited paragraph as "argumentative, immaterial, and speculative." Dkt. 147 ¶ 5. However, Eldan's objection affirms that its engineer Lars Eriksen testified at his deposition that it would be possible to mechanically circumvent the safety switch by holding it down with duct tape. *See id.*; dkt. 138-1 at 56:9–13. The Court therefore finds this fact to be undisputed and admitted.

[3] The precise extent of this practice is disputed. *See, e.g.* dkt. 148 ¶¶ 13, 17, 19. However, it is undisputed that at least some employees, in addition to Mr. Martinez, routinely used the M6 without a bushing. *See, e.g., id.* ¶¶ 8–10, 14.

[4] Mr. Martinez disputes that Eldan shipped the M6 in question to USM with all required safety decals. Dkt. 142 ¶ 10. He notes that the invoice for USM's purchase does not indicate whether any safety decals were included. *Id.*; *see* dkt. 138-4. However, this observation is unavailing, as the invoice does not itemize the M6's components. Dkt. 138-4. Rather, it contains only two entries: one for the entirety of the machine, and one for shipping and handling. *Id.* It would not be reasonable to draw an inference from this invoice that Eldan did not include the safety decals. Conversely, Eldan's engineer affirmatively testified that the decals were included with the M6 in question. DSOF ¶ 4; *see* dkt. 1 at 47:19–22. The Court therefore finds it uncontested that the M6 was shipped with all required safety decals.

be able to run without a bushing. However, no evidence in record conclusively establishes the manner of modification—*i.e.*, whether the safety switch was held down mechanically or bypassed electrically.[5]

On the day of the accident, Mr. Martinez was operating the M6 in question without a bushing, contrary to manufacturer guidelines. According to his deposition testimony, he understood that the bushings were for his protection, although the parties dispute the extent to which he understood the danger that the bushings help guard against. *Compare* DSOF ¶¶ 13, 40; *with* PSOF ¶¶ 1, 25, 26. Mr. Martinez had previously complained to a coworker that his M6 was jamming up at times, although he testified that on May 11, 2020, the machine had been working fine. He attempted to use the machine to strip a piece of cable that was smaller than the others, but at first it would not go in. On previous occasions when this happened, he would push on the cable two or three times, and eventually the M6 would accept it. Dkt. 138-8 at 56:6–11. This time, however, when Mr. Martinez pushed on the cable, it went all the way into the machine, along with his right arm. As a result of the ensuing injuries, Mr. Martinez's arm had to be amputated above the elbow after he arrived at the emergency room.

**Procedural History**

Mr. Martinez timely filed his complaint in the Circuit Court of Cook County on May 6, 2022. Eldan removed to the Northern District of Illinois on August 11, 2022 on the basis of diversity jurisdiction. On January 4, 2023, Eldan filed a third-party complaint against USM, alleging that USM should be liable for contribution in the event that Mr. Martinez prevailed on his claims against Eldan. Dkt. 36. After two and a half years of discovery, Mr. Martinez and USM reached a settlement in April 2025. Dkt. 123. Under the terms of the agreement, USM waived its worker's compensation lien against

[5] At some point between the machine's delivery and an inspection in November 2024, the wires leading to the safety switch on the M6 in question were replaced. DSOF ¶ 21; dkt. 138-13 at 121:1–11. However, there is no evidence that this re-wiring bypassed the safety switch or otherwise changed the functioning of the machine. Dkt. 142 ¶ 21; *see* dkt. 138-12 at *6, 9, 12. It is also unknown whether the new wires were installed before or after the accident. Dkt. 138-13 at 121:23–122:2.

Mr. Martinez and therefore became released from liability for any claim of contribution. *Id.* ¶ 17. Eldan did not object. Dkt. 130. The Court approved the settlement and dismissed USM with prejudice. *Id.* On October 23, 2025, Eldan filed the instant motion for summary judgment. Dkt. 137. The Court took the matter under advisement on January 9, 2026, after the parties timely filed all their respective responses and replies.

## LEGAL STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). A genuine dispute as to any material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The Court "consider[s] all of the evidence in the record in the light most favorable to the non-moving party, and… draw[s] all reasonable inferences from that evidence in favor of the party opposing summary judgment." *Logan v. City of Chicago*, 4 F.4th 529, 536 (7th Cir. 2021) (quotation omitted). After "a properly supported motion for summary judgment is made, the adverse party must set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 250 (quotation omitted). In deciding whether summary judgment is appropriate, the court "may not weigh conflicting evidence or make credibility determinations." *Omnicare, Inc. v. UnitedHealth Grp., Inc.*, 629 F.3d 697, 704 (7th Cir. 2011) (cleaned up).

## DISCUSSION

Mr. Martinez brings claims under Illinois law for strict products liability and for negligence. All parties agree that Mr. Martinez was not using the M6 according to manufacturer guidelines, that the machine had been dangerously modified, and that the accident would not have occurred if the M6 had a properly installed bushing. However, Mr. Martinez argues that the design of the M6 was

nevertheless defective because it permitted an operator to easily circumvent the bushing safety switch. Mr. Martinez also contends that Eldan did not adequately warn operators about the danger of using the machine without a bushing. Eldan believes that the uncontested evidence establishes that it could not reasonably have anticipated that anyone would modify the M6 to run without a bushing, and that the machine's safety warnings were more than adequate. As such, it argues that it is entitled to judgment as a matter of law on all counts.

## I. Foreseeability

Under Illinois state court precedent, "Where an unreasonably dangerous condition is caused by a modification to the product after it leaves the manufacturer's control, the manufacturer is not liable unless the modification was reasonably foreseeable. Foreseeability means that which it is *objectively reasonable* to expect, not merely what might conceivably occur." *Davis v. Pak-Mor Mfg. Co.*, 284 Ill. App. 3d 214, 220 (1996) (citations and internal quotations omitted); *see also Augenstine v. Dico Co.*, 135 Ill. App. 3d 273, 277 (1st Dist. 1985) (citing *Winnett v. Winnett*, 57 Ill. 2d 7, 12 (1974)) (when undisputed that plaintiff's injury was caused by a dangerous modification, summary judgment turns on whether the modification was reasonably foreseeable). Here, foreseeability is a requisite element of Mr. Martinez's defective design claims. As such, if the uncontested evidence establishes that no reasonable jury could find it reasonably foreseeable that the M6 would be modified to run without a bushing, then Eldan would be entitled to summary judgment in its favor.

*Davis* establishes that the question of foreseeability in a case such as this should be analyzed as follows:

> If a product is capable of easily being modified by its operator, and if the operator has a known incentive to effect the modification, then it is objectively reasonable for a manufacturer to anticipate the modification. Conversely, if the alteration of the product requires special expertise, or otherwise is not accomplished easily, then it is not objectively reasonable for a defendant to foresee the modification.

*Davis*, 284 Ill. App. 3d at 220 (citations omitted); *see also Perez v. Sunbelt Rentals, Inc.*, 2012 IL App (2d) 110382, ¶ 8 (quoting *Davis* for its statement of applicable law); *Gillespie v. Edmier*, 2019 IL App (1st) 172549, ¶ 56, *aff'd*, 2020 IL 125262, 182 N.E.3d 54 (same); *Ravizza v. PACCAR, Inc.*, 2020 IL App (1st) 181109-U, ¶ 57 (same). As such, the issue of foreseeability in this context involves two questions. First, was it easy for an operator to perform the modification to the M6 that created the dangerous condition? Second, was there an incentive for making the modification? If either answer is negative, then the modification was not legally foreseeable. The Court will address each question in turn.

*A. Ease and Extent of Modification*

Eldan argues that the M6's modification required "specialized knowledge and tools" and that the modification should therefore be held unforeseeable as a matter of law. Dkt. 139 at *14. If a modification can only be accomplished through application of "technical expertise, beyond that possessed by the average machine operator," then it is not one that a manufacturer can reasonably be expected to anticipate. *Davis*, 284 Ill. App. 3d at 220; *see also Woods v. Graham Eng'g Corp.*, 183 Ill. App. 3d 337, 342 (1989). Here, all parties agree that an electrical modification to bypass the bushing safety switch would require specialized tools and knowledge. *See* dkt. 142 ¶ 33. As such, if the modification to the M6 was electrical, then it is doubtful that Eldan could have reasonably anticipated it. However, the evidence does not establish how the M6 was modified. It is undisputed that a much simpler modification—namely, holding the switch down with a piece of duct tape or similar—would also permit the M6 to run without a bushing installed. PSOF ¶ 5; *see supra* note 2. In its reply brief, Eldan appears to concede that a mechanical modification using duct tape would be relatively easy to apply. *See* dkt. 148 at 5–6.

Eldan nevertheless contends that the ease of mechanical modification is irrelevant here because, it claims, there is no evidence that a mechanical modification occurred. *Id.* However, the Court disagrees with Eldan's understanding of the evidence. *Cf. Logan*, 4 F. 4th at 536 (on summary

judgment, a court must "draw all reasonable inferences from th[e] evidence in favor of the party opposing summary judgment"). The parties agree that a modification of some kind must have occurred. No evidence in record conclusively establishes the type of modification, but the parties have discussed two possible theories: electrical modification and mechanical modification. Evidence establishes that depressing the safety switch with duct tape (or similar) would have been easy for anyone to implement and would likely be easy to reverse, while electrically bypassing the safety switch would require specialized knowledge and tools and would likely be more difficult to reverse once implemented. On the other hand, the evidence also establishes that the M6's safety switch was re-wired at some point, but possibly after the accident occurred, and possibly not in a manner affecting the switch's functioning. A jury could look at these facts and reasonably conclude that either theory of modification presents the most plausible explanation. Thus, contrary to Eldan's assertion, Mr. Martinez's argument that the M6's modification was likely mechanical does not ask the Court "to accept speculation over record evidence." Dkt. 148 at *6. Rather, Mr. Martinez points out the impropriety of choosing between two plausible theories on a motion for summary judgment. *See Spiegla v. Hull*, 371 F.3d 928, 935 (7th Cir. 2004) ("Summary judgment is inappropriate when alternate inferences can be drawn from the available evidence.") Under these evidentiary circumstances, the question of whether the M6's modification was easy to perform or else required specialized knowledge and tools is not a question that can be decided before trial.

Finally, Eldan argues that, regardless of whether it was mechanical or electrical, the modification of the M6 constitutes a substantial change to the machines' design that it could not reasonably have anticipated. Illinois courts have held that a "major change in the design" of a product by a third party can potentially render such alterations legally unforeseeable. *Woods*, 183 Ill. App. 3d at 343. However, the Court observes that Eldan has not cited any case more recent than 1989 to support this proposition. *See* dkt. 148 at *2–3. In contrast, many more recent cases do not engage in such

analysis. *See, e.g., Davis*, 284 Ill. App. 3d at 220 (1995); *Perez*, 2012 IL App (2d) 110382; *Gillespie*, 2019 IL App (1st) 172549; *Ravizza*, 2020 IL App (1st) 181109-U. But regardless, the Court sees little reason to conclude, as a matter of law, that the M6's alteration constituted a "major change in the design," particularly when the evidence does not establish what sort of modification occurred. While it is true that the machine was designed to run with a bushing, and that the use of a bushing was an important safety feature, the machine was also designed to let operators remove and re-install bushings with relative ease. *See* dkt. 147 ¶ 12; dkt. 138-7 ¶ 6.3; dkt. 138-11 at *2. If the modification was mechanical, as is reasonable to infer, then it seems a significant stretch to say that using duct tape to hold down a switch—underneath a component that is designed to be swapped in and out by the operator—constitutes a "major change to the design" of the M6. Further, Plaintiff's industrial machinery expert, Dr. William S. Howard, opined in his report that

> Failure to replace a guard—especially one that is frequently removed and takes several minutes to replace—is one of the most common mistakes made by users of a machine. It is a problem that is well known through the industry, and it is one that I bring up in every single safety seminar that I teach. It is a very foreseeable issue.

Dkt. 138-9 at 50; *see also id.* at 49; dkt. 147 ¶ 26 (Eldan concedes that Dr. Howard believed it foreseeable that a user would bypass the M6 safety switch, but disagrees with the validity of his opinion).

The Court therefore concludes that the undisputed evidence establishes that a mechanical modification of the M6 would be easy to implement, but also that a genuine dispute exists as to whether a mechanical modification actually happened. A reasonable jury could decide either way.

### *B. Incentive to Modify*

Even if a dangerous modification to a product is simple to implement, Illinois courts have held that there is no reason for a manufacturer to predict that users will make such a modification if no reasonable incentive exists to modify the product in that way. *Davis*, 284 Ill. App. 3d at 220. Here, Eldan argues that there is "no operational incentive or reason for an operator to operat[e] the machine

without a bushing[.]" Dkt. 139 at *10. As such, they contend that Eldan could never have predicted that USM workers would modify the M6 in that manner.

However, the evidence in record conflicts greatly as to whether such an incentive exists. Mr. Martinez argues that operators are incentivized to use the M6 without a bushing because swapping out the bushing every time a cable of a different diameter needs to be stripped takes additional time. In a facility that runs cable strippers nearly twenty-four hours a day, such as USM's facility, even small increases to the time it takes to perform a task can cumulatively add up to a significant decrease in productivity. Mr. Martinez also argues that the apparently relatively widespread practice at the USM facility of operating an M6 without a bushing indicates that, despite their denials, USM's managers at least tacitly approved of the practice—thus placing their credibility in question. Moreover, USM's safety inspector, Robert MacNeice, testified that some small materials are difficult to feed into the machine if a bushing is installed.[6] PSOF ¶ 10. In contrast, Eldan cites to deposition testimony from USM managers and from its own engineer that using the M6 without a bushing creates no operational advantage and, moreover, makes the machine less efficient because it is more likely to jam up. The fact that the machine did, in fact, jam up when used without a bushing tends to support Eldan's view of the case. Looking at the record as a whole, the Court can only conclude that evidence of an operational incentive points strongly in both directions. It is not this Court's role on a motion for summary judgment to decide which collection of evidence presents a stronger case. *Omnicare*, 629 F.3d at 704 (when deciding summary judgment, a court "may not weigh conflicting evidence").

In sum, genuine disputes of material fact exist as to whether the M6 was mechanically modified and as to whether operators had a reasonable incentive to run the M6 without a bushing. As such, a reasonable jury could conclude that Eldan should have anticipated that operators would mechanically

---

[6] Eldan argues that this statement constitutes hearsay. However, Mr. MacNeice presented this information as a fact within his knowledge, not as a report of what other employees told him. *See* dkt. 138-14 at 102:6–13. Accordingly, this statement does not meet the definition of hearsay. *See* Fed. R. Evid. 801(c).

modify the M6. The Court therefore denies Eldan's motion for summary judgment with respect to the issue of foreseeability.

## II. Duty to Warn

Finally, the parties spend some additional pages in their briefs arguing whether the evidence in record demonstrates that Eldan did not adequately warn operators of the potential danger of using the machine. The Court is not certain whether Mr. Martinez alleges a failure to warn as part of the improper design theory that occupies most of the parties' attention, or as an entirely separate theory of product liability. Much of this dispute hinges on whether Eldan delivered the M6 in question to USM without any safety decals. As noted above, the Court finds no evidence to suggest that Eldan neglected to include the decals. *See supra* note 4. Nevertheless, the Court finds that the evidence does not establish conclusively whether the warning decals, and any other warnings that Mr. Martinez may have received, were *sufficient* in light of the danger posed by using the machine without a bushing, and in light of the ease by which the machine could be mechanically modified to run without a bushing. *See Hakim v. Safariland, LLC,* 79 F.4th 861, 869 (7th Cir. 2023) ("[T]he mere fact that warnings were given 'is not conclusive [evidence] that the warnings were adequate.'" (quoting *Collins v. Sunnyside Corporation,* 146 Ill. App. 3d 78, 81 (1986))). Eldan argues that Mr. Martinez testified at his deposition that he understood that using the M6 without a bushing was dangerous, DSOF ¶ 13, but the deposition testimony does not indicate whether he understood the extent of the danger, or whether using the machine without a bushing could result in injury to his entire arm (as opposed to just his fingers). While a jury could easily view the evidence and determine that Eldan satisfied its obligation to warn users of the dangers of using the machine without a bushing, or that the danger of the machine was self-evident, a reasonable jury could also decide otherwise. Determining the adequacy of Eldan's warnings is a quintessential exercise in weighing evidence that is improper for summary judgment.

The Court therefore denies Eldan's motion for summary judgment with respect to whether Eldan adequately performed its duty to warn.

## CONCLUSION

The Court denies Defendants' motion for summary judgment [137].

**IT IS SO ORDERED.**

Date: 9/29/2026

Entered: ______________________________
SHARON JOHNSON COLEMAN
United States District Judge